# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MISSOURI

| | |
|---|---|
| MICHAEL TUCKER, on behalf of himself and all others similarly situated, | Case No. *Not Yet Assigned* |
| Plaintiff, | Judge: *Not Yet Assigned* |
| v. | |
| FORD MOTOR COMPANY, | (Removed from the Circuit Court of Saint Louis County, Missouri) |
| Defendant. | State Court Docket No. 19SL-CC0498 |

Michael C. Bowgren (MO Bar # 57450)
BRINKER & DOYEN LLC
34 North Meremac, 5th Floor
Saint Louis, MO 63105
Phone: (314) 754-6006
Fax: (314) 863-8197
mbowgren@brinkerdoyen.com

Laura K. Brooks (MO Bar # 56454)
Stephen M. Bledsoe (MO Bar # 47048)
BERKOWITZ OLIVER LLP
2600 Grand Boulevard, Suite 1200
Kansas City, MO 64108
Phone: (816) 561-7007
Fax: (816) 561-1888
lbrooks@berkowitzoliver.com
sbledsoe@berkowitzolver.com

John M. Thomas (MO Bar # 63647)
DYKEMA GOSSETT PLLC
2723 S. State St., Suite 400
Ann Arbor, MI 48104
Phone: (734) 214-7613
Fax: (855) 262-3751
jthomas@dykema.com

*Attorneys for Defendant Ford Motor Company*

**DEFENDANT'S NOTICE OF REMOVAL PURSUANT TO 28 U.S.C. §§ 1332(d), 1441(a), 1446, AND 1453(b).**

**TO THE CLERK OF THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MISSOURI AND TO PLAINTIFF AND HIS COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE THAT** Defendant Ford Motor Company ("Ford") effects the removal of this action from the 21st Judicial Circuit Court of St. Louis County, Missouri to the United States District Court for the Eastern District of Missouri. Removal is proper based on the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), 28 U.S.C. § 1446, and 28 U.S.C. § 1453(b). Venue is proper in this Court because Plaintiff Michael Tucker filed his petition in the St. Louis County Circuit Court. *See* 28 U.S.C. § 105(a) (St. Louis County is part of Missouri's Eastern District); *id.* § 1391 (describing where venue is proper).

Pursuant to E.D. Mo. L.R. 2.03, attached to this Notice of Removal as **Exhibit A** is the entire State Court File ("SCF")—i.e., "all process, pleadings, orders, and other documents on file in the state court" at the time of this notice of removal, plus "a copy of the state court's docket sheet."  Also attached as **Exhibit B** is the Declaration of Laura Brooks ("Brooks Decl."), with **Exhibits 1–3**.

### FACTUAL BACKGROUND AND STATE COURT PROCEEDINGS

1. Plaintiff originally filed a petition styled *Michael Tucker v. Bommarito Ford, Inc. & Ford Motor Company*, Case No. 19SL-CC00498, in the St. Louis County Circuit Court, asserting only individual claims against both Ford and Bommarito Ford, Inc. (the dealership that sold him his vehicle). (SCF at 15.)  On March 17, 2022, Plaintiff filed a Third Amended Petition ("TAP") against only Ford (excluding Bommarito Ford, Inc.), adding claims on behalf of putative classes. (SCF at 908.)  The TAP was electronically served on Ford the same day. (*See id.*)

2.	The TAP alleges that Plaintiff purchased a 2018 Ford Focus. (TAP ¶ 10.) It alleges that his vehicle had corrosion on its underbody and the treatment performed by Bommarito Ford did not fully remove the corrosion. (*See, e.g., id.* ¶¶ 14-16.) It alleges that all 2011–2018 model year Ford Focuses "were manufactured with subframes and undercarriages that lack adequate rust corrosion protection" and are therefore "prone to experiencing excessive rust corrosion, rendering the vehicles unstable and unsafe to drive." (*Id.* ¶¶ 1-2.)

3.	The TAP brings claims on behalf of two putative classes: (1) a "Declaratory Relief Class" of "[a]ll persons and entities in the state of Missouri who purchased a model year 2011–2018 Ford Focus for their own use and not for resale," and (2) a manifestation subclass of all those "persons and entities" whose putative class vehicles actually had "a subframe or undercarriage that exhibited rust corrosion." (*Id.* ¶¶ 35, 37.)

4.	The TAP asserts a cause of action for "Declaratory Relief" on behalf of Plaintiff and the putative "Declaratory Relief Class." It also asserts three causes of action on behalf of Plaintiff and the putative manifestation subclass: (1) violation of the Missouri Merchandising Practices Act ("MMPA"), (2) breach of express and implied warranty under the Magnuson-Moss Warranty Act, and (3) unjust enrichment. (*See id.* ¶¶ 51-97.)

5.	Plaintiff seeks relief on a class-wide basis. (*See id.* at p. 19 ("WHEREFORE" clause).) Plaintiff seeks the following declaratory judgments: (1) all "model years 2011–2018 Ford Focus vehicles lack adequate rust corrosion protection and are defective," (2) Ford must provide notice of the defect to all members of the putative "Declaratory Relief Class," and (3) Ford must establish an "inspection, repair, and replacement program pursuant to which Defendant … will inspect, upon request, Class members' Subject Focus Vehicles for subframe or undercarriage rust corrosion, treat Subject Focus Vehicles that have not exhibited rust corrosion with adequate rust

corrosion protection, and to repair or replace the subframes or undercarriages on Subject Focus Vehicles that have experienced rust corrosion." (*Id.* ¶ 97.) Plaintiff also seeks: (a) "actual, compensatory, and consequential damages," (b) "statutory damages," (c) "restitution and disgorgement," (d) "exemplary damages," (e) "pre-judgment and post-judgment interest," and (f) "reasonable attorneys' fees, cost, and expenses." (*Id.* at p. 19.)

## REMOVAL IS PROPER UNDER CAFA

### The Standard For Removal Under CAFA

6. "A primary purpose in enacting [the Class Action Fairness Act (CAFA)] was to open the federal courts to corporate defendants out of concern that the national economy risked damage from a proliferation of meritless class action suits." *Pirozzi v. Massage Envy Franchising, LLC*, 938 F.3d 981, 983 (8th Cir. 2019) (quotation marks omitted). Under CAFA, district courts have original jurisdiction over class action lawsuits filed under federal or state law in which (1) any number of a class of plaintiffs is a citizen of a state different from any defendant, and (2) the amount in controversy for the putative class members in the aggregate exceeds the sum or value of $5,000,000, exclusive of interest and costs. *See* 28 U.S.C. § 1332(d)(2). The proposed class must also contain at least 100 members. *Id.* § 1332(d)(5).

7. CAFA defines a "class action" as "any civil action filed under Rule 23 of the Federal Rules of Civil Procedure or similar State statute . . . authorizing an action to be brought by 1 or more representative persons as a class action." 28 U.S.C. § 1332(d)(1)(B). The TAP counts as a "class action" subject to CAFA. (*See* TAP at p. 1 ("class action" bought "on behalf of all others similarly situated").)

8. Class actions that satisfy CAFA's requirements are removable pursuant to 28 U.S.C. § 1446. Under that provision, "a defendant seeking to remove a case to a federal court must

file in the federal forum a notice of removal 'containing a short and plain statement of the grounds for removal.'" *Dart Cherokee Basin Operating Co. v. Owens*, 574 U.S. 81, 87 (2014) (quoting 28 U.S.C. § 1446(a)). This "short and plain statement" standard "tracks the general pleading requirement stated in Rule 8(a) of the Federal Rules of Civil Procedure, . . . clarify[ing] that courts should apply the same liberal rules to removal allegations that are applied to other matters of pleading." *Id.* (quotation marks omitted). As described below, this case meets all the requirements for CAFA removal, and is timely and properly removed by the filing of this Notice.

### The Minimal Diversity Requirement Is Satisfied.

9. Under CAFA's "minimal diversity" requirements, removal is proper if "any member of a class of plaintiffs is a citizen of a State different from any defendant." 28 U.S.C. § 1332(d)(2)(A). In other words, all that is required is that "any class member and any defendant are citizens of different states." *McAllister v. St. Louis Rams, LLC*, No. 4:16-CV-172 SNLJ, 2018 U.S. Dist. LEXIS 48771, at *7 (E.D. Mo. Mar. 21, 2018).

10. Plaintiff is a citizen of Missouri, where he resides. (TAP ¶ 4); 28 U.S.C. § 1332(a)(1).

11. Ford is a Delaware corporation with its principal place of business in Dearborn, Michigan. (*See* TAP ¶ 5 (describing Ford as "a foreign corporation from Michigan").) Ford is therefore a citizen of Delaware and Michigan. *See* 28 U.S.C. § 1332(c)(1) ("[A] corporation shall be deemed to be a citizen of every State … by which it has been incorporated and of the State … where it has its principal place of business …. ").

12. CAFA's minimal diversity requirement is satisfied here because Plaintiff is a citizen of Missouri, while Ford is a citizen of Delaware and Michigan.

**The 100 Class Members Requirement Is Met.**

13. CAFA's requirement that the proposed class contain at least 100 members is also satisfied. 28 U.S.C. § 1332(d)(5). "The number of proposed class members may be determined from the face of the complaint." *Downing v. Riceland Foods, Inc.*, 298 F.R.D. 587, 590 (E.D. Mo. 2014). Since the TAP alleges that the proposed class includes "at least tens of thousands" of class members, this requirement is satisfied. (TAP ¶ 40.)

**The $5 Million Amount In Controversy Requirement Is Satisfied.**

14. Ford denies that Plaintiff's claims are appropriate for class treatment and further denies that Plaintiff or the putative classes are entitled to any relief whatsoever. Nevertheless, as alleged by Plaintiff, the amount in controversy satisfies CAFA's $5,000,000 requirement.

15. When, as here, a class action complaint does not specifically "allege that more than $5 million is in controversy, 'a defendant's notice of removal need include only a plausible allegation that the amount in controversy exceeds the jurisdictional threshold.'" *Pirozzi*, 938 F.3d at 983 (quoting *Dart Cherokee,* 574 U.S. at 89). "When plaintiffs have not challenged the removing defendant's amount-in-controversy allegations, this is a pleading requirement, not a demand for proof." *Id.* (quotation marks omitted). So "'when a defendant seeks federal-court adjudication, the defendant's amount-in-controversy allegation should be accepted when not contested by the plaintiff or questioned by the court.'" *Waters v. Home Depot U.S., Inc.*, No. 4:19-cv-02467-SNLJ, 2020 U.S. Dist. LEXIS 42119, at *12 (E.D. Mo. Mar. 11, 2020) (quoting *Dart Cherokee*, 574 U.S. at 87).

16. It is only at the point "when the plaintiff contests, or the court questions, the defendant's allegation" that "both sides submit proof and the court decides, by a preponderance of the evidence, whether the amount-in-controversy requirement has been satisfied." *Dart Cherokee*,

574 U.S. at 88–89. Once that happens, "the removing party . . . has the burden to establish not whether the damages sought *are* greater than the requisite amount, but whether a fact finder *might* legally conclude that they are." *Pirozzi*, 938 F.3d at 984 (quotation marks omitted) (emphasis in original). Even at that later stage, "[w]hen the notice of removal plausibly alleges that the class *might* recover actual damages, punitive damages, and attorneys' fees aggregating more than $5 million, [] the case belongs in federal court unless it is *legally impossible* for the plaintiff to recover that much." *Id.* (quotation marks omitted) (emphasis in original). "Even if it is highly improbable that the Plaintiffs will recover the amounts Defendants have put into controversy, this does not meet the legally impossible standard." *Id*. (quotation marks omitted).

17. Even at the later stage when a defendant's notice of removal is challenged and "the preponderance of evidence standard applies" (as opposed to this earlier stage where the notice is evaluated under a mere plausibility pleading standard), "'the defendant's showing on the amount in controversy may rely on reasonable assumptions.'" *Waters*, 2020 U.S. Dist. LEXIS 42119, at *14 (quoting *Arias v. Residence Inn by Marriott*, 936 F.3d 920, 922 (9th Cir. 2019)). The removing defendant "is permitted to rely on 'reasonable deductions, reasonable inferences, or other reasonable extrapolations' to establish the amount in controversy." *Id.* at *16 (quoting *Waters v. Ferrara Candy Co.*, 873 F.3d 633, 636 (8th Cir. 2017)). For example, "a credible estimate of the compensatory damages at issue" can be calculated by assuming that the percentage of a defendant's US sales in a particular state is equal to that state's percentage of the US population—even without any evidence that that state's residents buy the product at or above the average rate of customers nationwide. *McNamee v. Knudsen & Sons, Inc.*, No. 4:15-CV-572 (CEJ), 2016 U.S. Dist. LEXIS 26964, at *10 n.4 (E.D. Mo. Mar. 3, 2016).

18. Even making conservative assumptions, the amount in controversy here exceeds $5 million. For example:

- Plaintiff seeks various declaratory judgments on behalf of the entire putative "Declaratory Relief Class." When a plaintiff seeks equitable relief (*e.g.*, a declaratory judgment), the value of the equitable relief is included in calculating the amount in controversy. *See, e.g., United Seating & Mobility, L.L.C. v. Homen*, No. 4:05CV2208 JCH, 2006 U.S. Dist. LEXIS 7604, at *6 (E.D. Mo. Feb. 28, 2006) ("[U]nder the law of the Eight Circuit," the "value of [] equitable relief" "must be included in determining the amount in controversy."); *Springfield Remanufacturing Corp v. Leading Edge Power Solutions, LLC*, No. 6:21-cv-03146-MDH, 2021 U.S. Dist. LEXIS 150716, at *5 (W.D. Mo. Aug. 11, 2021) ("SRC's apparent argument that its declaratory judgment claim should be ignored for the purposes of establishing the amount in controversy because it only seeks equitable relief has been rejected by federal courts."). "'In actions seeking declaratory or injunctive relief, it is well established that the amount in controversy is measured by the value of the object of the litigation.'" *James Neff Kramper Family Farm P'ship v. IBP, Inc.*, 393 F.3d 828, 833 (8th Cir. 2005) (quoting *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 347 (1977)).

- The TAP alleges that the proposed class includes "*at least tens* of thousands" of class members, (TAP ¶ 40 (emphasis added)). In fact, Ford's records show that there were more than 62,000 putative class vehicles sold in Missouri. (Brooks Decl., Ex. 1.)

- Plaintiff seeks a declaratory judgment that would obligate Ford to inspect all putative class members' vehicles for "subframe or undercarriage" rust corrosion. (TAP ¶ 97.)  An inspection of 62,000 putative class vehicles would alone have a value of more than $5 million. While the TAP does not specify the amount of time that would be required for each such inspection, it took Plaintiff's expert two days to inspect Plaintiff's vehicle, and he claimed that even two days was not enough time to identify corrosion in hidden and less accessible areas of the vehicle that Plaintiff's expert claims might cause functional or operational problems.(SCF at 857 at 20:5–10 and 49:2–13 and SCF at 872 at 2, 8.) Even if each inspection could be completed in just one hour (a tiny fraction of the time spent by Plaintiff's expert), at a labor rate of $100 per hour (a rate well below the $148 per hour charged by Plaintiff's dealer), the value of such an inspection for 62,000 vehicles would be $6,200,000.[1]

- The compensatory damages sought by Plaintiffs for violation of the MMPA and for breach of warranty would be in addition to the cost of inspection and preventative treatment. The claims for compensatory damages appear to be brought on behalf of only those putative class members who have actually experienced subframe rust corrosion. According to the TAP, however, once significant corrosion manifests the vehicles are worthless absent repair or replacement. (TAP ¶ 2.) Further, Plaintiff's position is that a repair is "ludicrous" because a repair is not feasible. (Brooks Decl., Ex. 3.) Thus, Plaintiff appears to be demanding replacement vehicles for all putative

---

[1] Plaintiff's dealer charged him $119.10 for 0.8 hours (Brooks Decl., Ex. 2), which equates to an hourly rate of $148.87.

    class members whose vehicles experienced subframe rust corrosion. Determining the amount of compensatory damages at issue thus requires estimating the number of putative class vehicles with corrosion and the cost of replacing those vehicles.

- Plaintiff alleges that Ford did "not employ corrosion-preventative coatings or corrosion-resistant materials" in manufacturing putative class vehicles.(TAP ¶ 21.) The putative class vehicles are all 2011–18 Ford Focus vehicles, and this includes hundreds or thousands of vehicles that have been on the road and exposed to the elements, including road salt, for more than a decade. Under these circumstances, if the rate of vehicles with corrosion were only 0.5%, Plaintiff's claim would border on the frivolous. Therefore, while Plaintiff does not specify how many vehicles he believes will exhibit this corrosion, it is reasonable to infer that Plaintiff believes and is alleging that at least 0.5% of class vehicles, or at least 310 vehicles, will exhibit corrosion.

- Presumably, the cost of each appropriate replacement for these 310 vehicles would be approximately the same as the price Plaintiff paid for his vehicle, i.e., $19,000 (after a $3,500 rebate). (SCF at 835 at 35:25–36:2 and 37:8–10.) But even assuming that the average cost of a replacement vehicle is only $5,000, the cost of replacing those 310 vehicles would be $1,550,000.[2]

---

[2] Replacement cost may not be the proper measure of damages; rather, the measure of damages for violation of the MMPA, and for breach of warranty, is the difference between the actual value of the property and what its value would have been if it had been as represented. *Sunset Pools v. Schaefer*, 869 S.W.2d 883, 886 (Mo. Ct. App. 1994); Mo. Rev. Stat. § 400.2-714. According to the TAP, the actual value of his vehicle is $0, and the value as represented would approximate $19,000 (the price he paid). The difference is about $19,000. But again, even assuming the claimed difference in value is only $5,000, claimed damages for 0.5% of putative class vehicles would still total $1.55 million.

- Plaintiff also seeks punitive (exemplary) damages on behalf of class members for Ford's allegedly willful, wanton, and malicious violation of the MMPA. *See* TAP at p. 19 ("exemplary damages")); *Bennett v. Owens-Corning Fiberglass Corp.*, 896 S.W.2d 464, 466 (Mo. 1995) (calling punitive damages "exemplary or punitive damages"); *Propes v. Griffith*, 25 S.W.3d 544, 550 (Mo. Ct. App. 2000) (same). "[A] removing party may include . . . punitive damages in [the] amount in controversy." *McNamee*, 2016 U.S. Dist. LEXIS 26964, at *5 (citing *Crawford v. F. Hoffman—La Roche Ltd.*, 267 F.3d 760, 766 (8th Cir. 2001)); *see also Pirozzi*, 938 F.3d at 984 (recognizing that punitive damages, when demanded, are properly included within the amount in controversy). A "1:1 ratio" of punitive to compensatory damages would be "conservative." *Waters,* 2020 U.S. Dist. LEXIS 42119, at *14. Assuming a 1:1 ratio with the approximately $1,550,000 in actual damages places another $1,550,000 in punitive damages in controversy.

- For those putative Class Vehicles that are not exhibiting rust corrosion, the declaratory judgment sought by Plaintiff would require Ford to treat all of those vehicles with adequate rust corrosion protection. This, of course, would add to the value of the services demanded by Plaintiff as part the declaratory judgment he seeks. Plaintiff paid his dealer $119.10 for labor alone for a treatment he deemed inadequate. (Brooks Decl., Ex. 2.) Even assuming that an adequate treatment could be performed for a cost of $60 (about half of what Plaintiff paid), and assuming that 61,690 putative class vehicles would be treated (i.e., the 99.5% that do not manifest significant corrosion and do not need to be replaced) the value of that treatment to the putative class would be $3,701,400.

- Plaintiff seeks attorney fees, which are also included in calculating the CAFA amount in controversy. (*See* TAP at p. 19); *Pirozzi*, 938 F.3d at 983. "A class-action MMPA case involves some measure of risk and complexity that often generates considerable fees." *Waters,* 2020 U.S. Dist. LEXIS 42119, at *14 (quotation marks omitted). Assuming that fees are awarded in the amount of only 10% of the total value of the rust treatment, actual damages, and punitive damages, the amount in controversy would be increased by approximately $1.3 million in fees.

19. In sum, the total amount in controversy is approximately $14.3 million, calculated as follows:

| | |
|---|---:|
| Inspection of 62,000 Class Vehicles (1 hours@$100/hour): | $6,200,000 |
| Compensatory damages ($5000) for 310 Class Members: | $1,550,000 |
| Punitive damages for 310 Class Members (1:1 Ratio): | $1,550,000 |
| Corrosion Treatment of 61,690 Class Vehicles ($60/vehicle): | $3,701,400 |
| Subtotal: | $13,001,400 |
| Attorney fees (10% of subtotal): | $1,300,140 |
| Total: | $14,301,540 |

20. Even assuming that this calculation overstates the amount in controversy by 50%, the amount in controversy would still be well over $5 million. In fact, however, this calculation necessarily understates the amount in controversy for a number of reasons. For example, the cost of inspection calculated above assumes a 1-hour inspection even though Plaintiff's expert claims a much longer inspection is necessary to identify significant corrosion, and it assumes an hourly labor rate of only $100, well below the $148 hourly labor rate actually charged by Plaintiff's dealer. The above calculations also assume that, based on the allegations in the TAP, only 0.5% of the putative class vehicles' underbodies have significant corrosion. If the rate of significant underbody corrosion is only 0.5%, Plaintiff's claim that the putative class vehicles "are prone to experiencing excessive rust corrosion" because Ford allegedly "does not employ corrosion-preventative

coatings or corrosion-resistant materials in its manufacture of its vehicles," (*see, e.g.,* TAP 2, ¶¶ 21, 96), would border on the frivolous. It would not be unusual for some of these putative class vehicles' underbodies to have corrosion, particularly since many of those vehicles have been on the roads and exposed to the environment—including road salt—for ten years or more. And the cost of replacing Class Vehicles is likely to be more than $5,000 per vehicle. Changing any one of these conservative estimates would even further increase the amount in controversy beyond the approximately $14 million calculated above.

### **REMOVAL IS TIMELY**

21. This Notice of Removal is timely. "[I]f the case stated by an initial pleading is not removable, a notice of removal must be filed within 30 days after receipt by the defendant, through service or otherwise, of an amended pleading, motion, order or other paper from which it may first be ascertained that the case is one which is or has become removable." 28 U.S.C. § 1446(b)(3). Since none of Plaintiff's previous complaints asserted class claims, this case was never removable under CAFA until Plaintiff filed the TAP. And all of Plaintiff's previous complaints asserted claims against Bommarito Ford, a Missouri corporation whose inclusion may have prevented the case from falling within a federal court's diversity jurisdiction due to the lack of complete diversity. *See Flanigan v. Bank of Am.*, No. 4:15CV1191 JAR, 2016 U.S. Dist. LEXIS 24877, at *5-6 (E.D. Mo. Mar. 1, 2016) ("'It is, to say the least, well settled that federal diversity jurisdiction requires complete diversity, so that no defendant is a citizen of the same state as any plaintiff.'") (quoting *Walker v. Norwest Corp.*, 108 F.3d 158, 162 (8th Cir. 1997)). So this case first became removable when Plaintiff filed the TAP and served it on Ford, on March 17, 2022. (*See* TAP.) Since this notice of removal is filed within 30 days of March 17, 2022 it is timely.

22.     The one-year limitation on removing to federal court based on diversity jurisdiction, *see* 28 U.S.C. § 1446(c)(1), does not apply to class actions removable under CAFA. *See* 28 U.S.C. § 1453(b) ("A class action may be removed to a district court of the United States in accordance with section 1446 [28 USCS § 1446] (except that the 1-year limitation under section 1446(c)(1) [28 USCS § 1446(c)(1)] shall not apply) …."); *Reece v. Bank of N.Y. Mellon*, 760 F.3d 771, 776 (8th Cir. 2014) ("Regardless of how federal jurisdiction over a class action arises, § 1453(b) unambiguously provides that the one-year removal limit in § 1446(c)(1) does not apply" because "[a]ny other reading … would thwart congressional intent by permitting plaintiffs to evade federal jurisdiction through clever gamesmanship: filing an individual complaint in state court, waiting a year, then transforming the original complaint into a class action by amendment, when it would be too late for a defendant, now facing a class action, to file a notice of removal.").

**NOTICE TO PLAINTIFF AND STATE COURT**

23.     Contemporaneously with the filing of this Notice of Removal in the United States District Court for the Eastern District of Missouri, written notice of such filing will be served on Plaintiff's counsel of record: Thomas R. Applewhite, Steven A. Donner, and Christian T. Misner, Donner Applewhite, Attorneys at Law, 906 Olive Street, Suite 1110, Saint Louis, MO 63101. A copy of this Notice will also be filed with the Clerk for the 21st Judicial Circuit Court of St. Louis County, Missouri.

24.     The undersigned counsel is authorized by Ford to sign and file this Notice of Removal.

25.     As required by this Court's rules, Ford submits herewith a filing fee of $402.00.

Dated: April 13, 2021

Respectfully submitted,

**BERKOWITZ OLIVER LLP**

By: /s/ *Laura K. Brooks*
Stephen M. Bledsoe (MO Bar # 47048)
Laura K. Brooks (MO Bar # 56454)
2600 Grand Boulevard, Suite 1200
Kansas City, MO 64108
Phone: (816) 561-7007
Fax: (816) 561-1888
lbrooks@berkowitzoliver.com
sbledsoe@berkowitzoliver.com

Michael C. Bowgren (MO Bar # 57450)
BRINKER & DOYEN LLC
34 North Meremac, 5th Floor
Saint Louis, MO 63105
Phone: (314) 754-6006
Fax: (314) 863-8197
mbowgren@brinkerdoyen.com

John M. Thomas (MO Bar # 63647)
DYKEMA GOSSETT PLLC
2723 S. State St., Suite 400
Ann Arbor, MI 48104
Phone: (734) 214-7613
Fax: (855) 262-3751
jthomas@dykema.com

*Attorneys for Defendant Ford Motor Company*